STATE OF WISCONSIN, Plaintiff,

v.

Odric BAKER, Individually and as Chairman, Lac Courte Oreilles Tribal Governing Board, Pete Larson, Individually and as Vice Chairman, Lac Courte Oreilles Tribal Governing Board, Margaret Diamond, Individually and as Secretary-Treasurer, Lac Courte Oreilles Tribal Governing Board, Charles Diamond, Individually and as a member, Lac Courte Oreilles Tribal Governing Board, Theresa Williams, Individually and as a member, Lac Courte Oreilles Tribal Governing Board, Rick St. Germaine, Individually and as a member, Lac Courte Oreilles Tribal Governing Board, and their agents, employees, and subordinates, Defendants.

No. 76–C–359.

United States District Court,
W. D. Wisconsin.

Sept. 20, 1978.

John D. Niemisto, Asst. Atty. Gen., State of Wis., Madison, Wis., for plaintiff.

Larry B. Leventhal, Minneapolis, Minn., for defendants.

Gene M. Potack of Wisconsin Judicare, Inc., Wausau, Wis., for intervenors.

## OPINION AND ORDER

JAMES E. DOYLE, District Judge.

This is a civil action for declaratory relief brought by the State of Wisconsin against officers and members of the Tribal Governing Board of the Lac Courte Oreilles Band of Lake Superior Chippewa Indians.

■ It was commenced in the Circuit Court for Sawyer County, Wisconsin. Defendants have removed the action to this court, asserting in the petition for removal that the "requested relief constitutes an invasion of the area wherein the District Courts of the United States 'have original jurisdiction founded on a claim or right arising under the Constitution, treaties, or laws of the United States' (28 U.S.C. § 1441[b])." The petition goes on to cite various treaties, acts of Congress, tribal laws, and federal executive laws under which "the claim and rights of the defendants" assertedly arise. The test for removal is not the nature of the defendants' claim, but the plaintiffs'. However, the claim or right asserted by plaintiff State, purportedly as a trustee for the public, arises under acts of Congress, federal exec-

utive action, and treaties. No doubt for this reason, the removal has not been challenged. Unless jurisdiction is absent for reasons discussed below, it is present under 28 U.S.C. § 1331.

Plaintiff alleges: the tribal constitution authorizes the governing board to adopt ordinances generally, and specifically to regulate hunting, fishing, ricing, trapping and boating by members and nonmembers within the reservation; pursuant to that authority defendants have promulgated a tribal conservation code and a tribal court code, have stated that they intend to enforce the codes, and have agents enforcing the conservation code; title to the navigable lakes upon which defendants have stated their intention to enforce the code is in the State of Wisconsin and held in trust for all the public for fishing, navigation and recreation; defendants' enactment and enforcement of the conservation code infringes upon the state's title and duty to regulate the fishery resources of the state for the benefit of the public; and every defendant acted in excess of his or her authority as a member of the governing board by enacting and enforcing the codes. Plaintiff seeks a judgment declaring that defendants' promulgation and enforcement of the codes is invalid as it infringes on the right of the public to fish upon the lakes in question.

Defendants have filed an amended motion to dismiss plaintiff's complaint, citing these grounds: (1) there is no actual controversy between the parties to this action; (2) plaintiff has failed to join indispensable parties; (3) the sovereign immunity of the Lac Courte Oreilles Band bars this action; and (4) the legislative immunity of the individual defendants bars this action.[1] It is to this motion that this opinion and order are directed.

---

[1] The amended motion to dismiss includes a fifth ground: that the complaint fails to state a claim upon which relief can be granted. Apparently in explanation of this ground, defendants' brief asserts legislative immunity. Thus, the fifth ground coincides with the fourth.

Although not mentioned in the amended motion to dismiss, the contention is made in de-

fendants' brief that jurisdiction in this court is lacking because jurisdiction was lacking in the state court from which the action was removed. The issue has been briefed by both parties and I will consider it later in this opinion.

## CASE OR CONTROVERSY

Defendants argue first that the naming of individual members of the governing board as defendants is an attempt to evade the bar of sovereign immunity, but that the attempt must fail because the plaintiff has no controversy with the named individual tribal members. Defendants add that in their individual capacities, they have not acted "in such a way as to invade or prejudicially affect, the rights of the plaintiff." Since the individual defendants have not caused plaintiff any legal injury, they contend, plaintiff has not sufficiently alleged a "case or controversy" within the meaning of Article III, Section 2 of the United States Constitution.

This contention is difficult to analyze because it is so closely related to defendants' argument that the sovereign immunity of the Band bars the action. In both arguments, defendants seek to place at issue whether defendants were acting in their official or individual capacities.

■■■ But in determining whether there is a "case or controversy," the nature of defendants' capacities is not a necessary part of the analysis. The relevant factors to be considered in determining the presence of a case or controversy are whether the defendants have a personal interest in the outcome of the case, and whether they are parties against whom the requested relief can be granted. *Illinois Migrant Council v. Pilliod*, 540 F.2d 1062, 1067–1069 (7th Cir. 1976), *rehearing en banc* 548 F.2d 715. As the term "personal" is used in this context, it does not exclude one's interest in performing the functions of governmental employment or office. In *Illinois Migrant Council*, a class of people sued agents of the Immigration and Naturalization Service, challenging the constitutionality of the I.N.S. search policy. The court held that both the agents who executed the policy, and their superiors, had the requisite personal interest in the outcome of the case.

■■■ The present case is analogous. Plaintiff alleges that upon defendants' direction, agents of the defendants are enforcing the tribal conservation code, causing real and substantial injury to the plaintiff and those for whom it serves as trustee. Thus, defendants have a personal interest in the outcome of the case. And if relief is granted to plaintiff, the court can order defendants to direct their agents to discontinue enforcement of the code. Accordingly, it appears that plaintiff has sufficiently alleged a "case or controversy" whether it is directed against defendants in their official or individual capacities.

## SOVEREIGN IMMUNITY

It is quite clear from the complaint that defendants purported to be acting as members of the Tribal Governing Board in enacting and enforcing the codes at issue. Therefore, defendants contend, plaintiff's complaint actually presents a cause of action against the Band and such an action is barred by sovereign immunity.

■■■ Indian tribes are exempt from suit on the basis of traditional sovereign immunity, unless Congress has consented to the suit. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978); *Puyallup Tribe v. Washington Game Department*, 433 U.S. 165 at 172–173, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977). Plaintiff does not claim that Congress has consented to this suit against the tribe. A tribe may not be sued indirectly by suing its officers. However, tribal immunity does not protect tribal members sued in their individual capacities. *Means v. Wilston*, 522 F.2d 833 (8th Cir. 1975); *Weeks v. United States*, 406 F.Supp. 1309 (W.D.Okla.1975); *Seneca Constitutional Rights Organization v. George*, 348 F.Supp. 48 (W.D.N.Y.1972). Plaintiff relies on the theory that in enacting and enforcing the codes, defendants acted in excess of their authority, and therefore acted in their individual capacities.

In *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), a private corporation which had contracted to buy coal from the War Assets Administration sought an injunction prohibiting the Administrator from selling the coal to a third party after the Administrator had refused to deliver it to the plaintiff and had contracted for its

sale to the third party. In determining whether in effect the suit was a suit against the sovereign, the crucial question was considered to be not the denomination of party defendants, but whether the relief sought was relief against the sovereign; that is, whether the effect of a judgment would be to restrain the government from acting or to compel it to act. *Id.* at 688, 704, 69 S.Ct. 457; *see also Dugan v. Rank,* 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963). In the present case, a declaratory judgment that the tribal conservation and court codes are invalid and illegal as applied to the lakes in question would have the practical effect of restraining the Band's program of requiring licenses and enforcing other provisions of the code on those lakes.

■ However, there are at least two exceptions to the sovereign immunity rule when officers are named as defendants. As explained in *Larson,* these exceptions are invoked when an officer is claimed to have acted beyond his or her statutory powers, or when the statute or order conferring power upon the officer to act is claimed to be unconstitutional. *See Dugan v. Rank, supra* at 621–622, 83 S.Ct. 999; *Gautreaux v. Romney,* 448 F.2d 731 (7th Cir. 1971); *Scholder v. United States,* 428 F.2d 1123 (9th Cir. 1970).

In *Larson,* the court found that the Administrator's general power to administer the government sales program included the power to refuse to deliver goods when he thought it necessary to do so, and that the statute conferring the power was not claimed to be unconstitutional. Thus, the court held that sovereign immunity barred the action.

A similar analysis was employed in *Dugan, supra.* Property owners who would be affected by a large federal water project sued to prohibit officials of the United States Reclamation Bureau from taking plaintiffs' claimed water rights. Again the court determined first whether the effect of the judgment would be to restrain actions of the United States. Having answered that question affirmatively, it reviewed the statutory powers of the reclamation bureau officials. The court determined that the officials had acted within their powers, and that the taking of water rights did not amount to an unconstitutional taking of private property without just compensation. Sovereign immunity applied. *See also Scholder, supra.*

In the present case, plaintiff contends that although defendants are members of the governing board of the Band, sovereign immunity is not present because they are acting in excess of authority conferred upon them in that capacity. To test the validity of this contention, it is necessary to examine the factual and legal sources of the Band's authority, if any, to control fishing by non-members in the lakes in question.

■ In *United States v. Bouchard,* 464 F.Supp. 1316, decided September 20, 1978, I held that title to the beds of navigable waterways within the Bad River Indian Reservation passed from the federal government to the State in 1848, and remains in the State today. For the reasons explained in that opinion, I now hold that the State has title also to the beds of the navigable lakes at issue in this case.[2] I also expressed the opinion in *Bouchard,* however, that even though title to the navigable waterways rests in the State, the federal government probably retained the constitutional power to grant exclusive use of the waterways to Indian tribes. *Bouchard,* footnote 9. Thus, it may be that since 1848 the Lac Courte Oreilles Band has obtained from the federal government the right of exclusive use of the lakes at issue.

The only possible time at which, and the only possible instrument through which, the federal government might have granted to the Band such a right of exclusive use is the treaty of 1854. The treaty of 1854 contains no mention of a grant of exclusive hunting or fishing rights. Therefore, if a grant of

---

**2.** Nothing in the language or history of the 1837 treaty would support a contention that under that treaty, as distinct from the 1842 treaty, the Chippewa reserved exclusive hunt-

ing and fishing rights in the lands ceded in 1837, so as to prevent title to the navigable waters from passing to the State when the State came into being.

any such right of exclusive use is embodied in the 1854 treaty, it can only be because such a right is implied in the provisions for the creation of several Indian reservations, including the Lac Courte Oreilles reservation. It has been held that an Indian tribe for whom a reservation has been created does enjoy the right to regulate fishing by nonmembers in waters which are a part of the reservation. *Quechan Tribe of Indians v. Rowe*, 531 F.2d 408 (9th Cir. 1976); *Confederated Tribes of Colville Indian Reservation v. State of Washington*, 412 F.Supp. 651 (E.D.Wash.1976). *See also* House Rep. # 625, Senate Rep. # 1686 on P.L. 86–634 § 2 (18 U.S.C. § 1165), 86th Cong., 2nd Sess. (1960).[3]

■ Although, as I have said, the United States probably retains the constitutional power to grant to Indian tribes exclusive use of navigable waterways even after title to the beds of the waterways have passed to the states upon their admission to the union, there is a question whether it is permissible for the United States to effectuate such a grant by the device of including such navigable waterways within the borders of a newly created reservation. My opinion is that it is permissible for the United States to employ the device of a treaty.

Courts have repeatedly held that lands which are privately held by non-Indians in fee simple can nevertheless be part of an Indian reservation. *Mattz v. Arnett*, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973); *Seymour v. Superintendent of Washington State Penitentiary*, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962); *United States v. Erickson*, 478 F.2d 684 (8th Cir. 1973); *The City of New Town, N. D. v. United States*, 454 F.2d 121 (8th Cir. 1972); *Russ v. Wilkins*, 410 F.Supp. 579 (N.D.Calif. 1976). In *Erickson, supra* at 688, the court explained:

> It was originally held that Indian Country ceased to be such whenever Indians lost title to the land. [citations omitted]

This view has been laid to rest by the present definition of "Indian Country" which includes all land within an Indian reservation notwithstanding the issuance of any patent. [citations omitted] Therefore, the fact that the 1908 Act removes title to reservation lands from the Indians and places it into the hands of non-Indians does not, by itself, affect the exterior boundaries of the reservation.

Each of the cases cited above involves established reservations, where title to some of the land has been transferred to non-Indians. The courts have held that without some affirmative indication that the reservation was to be correspondingly diminished, transfer of title to a nonmember was not sufficient to take the land out of the reservation.

In the present case the issue is whether the lakes were made part of the Lac Courte Oreilles reservation at the time it was established rather than whether lakes which were originally a part of a reservation have been removed subsequently. But the cited decisions directed to the latter question provide support for the proposition that the presence of title in the Indians or in the United States is not an element essential to making lands part of a reservation. Such a holding would also be in accordance with the requirement that Indian treaties be construed as the Indians would have understood them. *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970); *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832). The Indians did not have an understanding of the white man's theoretical concept of legal title. Rather, they understood the more practical concept of the right to use and occupy, undisturbed by intruders, as the highest form of "ownership" of territory.

■ I am aware that many of the cases cited above for the principle that the presence of title in the Indians or in the United

---

**3.** There is a serious question, however, whether the tribal courts enjoy jurisdiction in proceedings to enforce the Band's fishing regulations against nonmembers. *Oliphant v. Suquamish Indian Tribe*, 1978, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209. Recently, counsel for the de-

fendants has submitted unverified copies of the Band's court code and conservation code embodying amendments adopted May 12, 1978, apparently in response to *Oliphant*, limiting enforcement measures in the tribal courts to civil remedies.

States is not necessary for lands to be "part of the reservation" rely in part upon the definition of "Indian country" in 18 U.S.C. § 1151 which does not include title as an element. I am also aware that "Indian land," as that expression is used in the heading to § 1165, dealing with trespasses upon that land for the purpose of hunting, fishing or trapping, does refer to land the title to which is in the United States. *See Bouchard, supra.* Section 1165 appears to have been drafted so as to exclude from its protective provisions land within reservations held in fee by non-Indians. While title in the United States is required for federal criminal prosecution for trespass pursuant to § 1165, the narrower scope of a statute enacted for that limited purpose is not persuasive authority for a broader principle that title in the Indians or in the United States is necessary to inclusion of land as part of a reservation.

■■■ Accordingly, I hold that if the parties intended that a grant of the exclusive use of navigable waters was to be effectuated through the creation of the Lac Courte Oreilles reservation contemplated by the 1854 treaty, and if the lakes at issue were actually included in the reservation thus created, the Band would enjoy the authority to impose licensing upon nonmembers as a condition to fishing in those lakes, the defendants would be acting within the scope of this authority, and tribal sovereignty would bar this suit. A determination whether this was the intention of the parties to the 1854 treaty, and whether they carried it out, requires consideration of the history of relations and negotiations between the Band and the United States from the time of the 1837 treaty to the time of the 1873 executive action approving the selection of lands for the reservation, as well as any other circumstances or events which would elucidate the purposes of the parties to those transactions. *See United States v. Top Sky*, 547 F.2d 486 at 487 (9th Cir. 1976).

That determination goes to the merits of the controversy, as well as to the issue whether sovereign immunity bars the action. The parties have not submitted complete evidence on that issue. Thus, pending an evidentiary hearing, I will defer my decision on whether sovereign immunity bars this action.

## ABSENT PARTIES

■■■ Defendants contend that in the absence of the United States and the Lac Courte Oreilles Band, this action must be dismissed. Under Rule 19 of the Federal Rules of Civil Procedure, such a contention is to meet with a pragmatic judicial response, applying the tests embodied in that rule. I will engage in such a pragmatic analysis. Thereafter, I will consider, however, whether previous judicial decisions deprive me of discretion and dictate the result in this case.

Rule 19(a) of the Federal Rules of Civil Procedure states that a party shall be joined if:

" . . . (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest . . . ."

The Band's interest in its asserted power to regulate fishing in the lakes and its interest in the fishing fees are clearly interests relating to the subject of this action. As a practical matter, if in the absence of the Band the named defendants are enjoined from requiring nonmembers to obtain fishing licenses, for a fee, the Band's ability to protect its interest will be impaired and impeded.

It is less clear whether the United States has an interest relating to the subject of this action and, if so, what the nature of that interest may be. No expression of the position of the United States has been made to the court. As I have held in *United States v. Bouchard*, title to the beds of these navigable waters is not in the United States, but in the State of Wisconsin. However, the United States controlled the terms upon which Wisconsin was admitted to the union, and it was a party to the treaties of 1837 and 1854. Because of its paramount role in the process of the admission of new states to the union, the United States may have an interest in vindicating

the interest of the State, in its purported role as trustee for the public, in access to the navigable lakes in question without interference by the defendants. On the other hand, because it was a party to the treaties of 1837 and 1854 through which the Band claims the right to license nonmembers, because of its special relationship to this particular Band and its reservation, and because of its special relationship to Indians and their reservations generally, the United States may have an interest, in vindicating the power of the Band and the named defendants to require licenses of nonmembers. If the United States does enjoy an interest allied to that of the State or an interest allied to that of the Band or the defendants, then as a practical matter, if in the absence of the United States either the interest of the State or the interest of the Band or the defendants is judicially vindicated, the ability of the United States to protect its interest in this matter will be impaired or impeded. I will assume, without deciding, that the United States does have an interest relating to the subject of this action, within the meaning of Rule 19(a)(2).

Rule 19(b) states:

> If a person as described in [Rule 19(a)] cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Neither the Band nor the United States can be made a party to this action unless its sovereign immunity is to be waived. Thus, I must determine whether in equity or good conscience, the action should proceed without them.

*Factor One: to what extent a judgment rendered in the absence of the Band or the United States or both might be prejudicial to the Band or the United States or both or those already parties.*

I see no prejudice to those already parties to this case if judgment were rendered favorably or unfavorably to them in the absence of the Band or the United States or both.

██ With respect to the Band, the extent of the prejudice would be major if a judgment adverse to the named defendants were rendered in the Band's absence. However, in evaluating this first factor enunciated in Rule 19(b), it is proper to consider the ability of an unjoined party to protect its interests by intervention or otherwise. 3A Moore's Federal Practice (1978) § 19.07–2[1], pp. 19–159 through 19–161. I note that the Band is the plaintiff in a closely related case in this court, *Lac Courte Oreilles Band v. Voigt*, 464 F.Supp. 1316, and that in another closely related case in this court, *United States v. Ben Ruby & Sons et al.*, 72–C–366, 464 F.Supp. 1316, the Band has been granted leave to appear as *amicus* and has so appeared. Also, affidavits of record in the present case revealed that the attorney of record for the named defendants in the present case has represented the Band in various matters, and that the attorney of record for the named defendants is being assisted by the Native American Rights Fund, which has been actively involved in recent years in the representation of the Band in certain matters. Plainly, the Band enjoys an opportunity to protect its interests fully by moving to intervene as a party in the present case. I appreciate that it is not a small matter for a sovereign to waive its immunity. But when the Band is already a participant in one or more other cases presently pending in this court involving the status of the Chippewa in Wisconsin, there is no reasonable basis for dismissing this action because of the absence of the Band and thus frus-

trating this plaintiff in its effort to obtain a judicial determination of related issues.

With respect to the United States, it is difficult to estimate the extent of the prejudice which might result if in its absence judgment was rendered either that the defendants possess the power, or that they do not possess the power, to compel nonmembers to be licensed in order to fish in the lakes at issue. Whether the United States shares the State's view of this question or that of the defendants and the Band, its interest in the matter will be affected by a judgment in this case only indirectly. The United States has appeared as plaintiff in a criminal prosecution in this court, *United States v. Bouchard,* 464 F.Supp. 1316, in which the question of title to the beds of navigable waters has been litigated. It has appeared as plaintiff in *United States v. Ben Ruby & Sons et al.,* 464 F.Supp. 1316, in which the question of title to Sections 16 within the Lac Courte Oreilles reservation has been litigated. If it considers that one or more of its important interests are at stake in the present action, it is free to move to intervene. It is not reasonable to dismiss the present action because of the absence of the United States, and thus to frustrate plaintiff in its effort to obtain a judicial determination of related issues.

*Factor Two: the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided.*

I see no way in which prejudice to the Band or to the United States, whatever it may be, can be lessened or avoided by such devices.

*Factor Three: whether a judgment rendered in the absence of the Band or the United States or both will be adequate.*

A judgment in the State's favor against the named defendants may prove inadequate from the State's viewpoint if either the Band or the United States were to attempt to proceed in a manner inconsistent with that judgment. This contingency appears unrealistic, but whatever its degree of realism, by its choice of parties the State appears willing to accept it.

Judgment in the defendants' favor should prove adequate from the defendants' and the Band's viewpoint.

Depending upon whether the United States shares the State's view of the merits or that of the defendants and the Band, a judgment's adequacy or inadequacy for the United States would correspond to its adequacy or inadequacy for the State or for the defendants and the Band.

*Factor Four: whether the plaintiff will have an adequate remedy if the action is dismissed for non-joinder.*

Perhaps I will be called upon in the course of this lawsuit to determine whether the State may maintain the action, on a trust theory, in behalf of the members of the public generally. For the present purpose, I assume that it may maintain such an action. I am unaware of any remedy available to the State as an alternative to an action of this kind for declaratory or injunctive relief. The sovereign immunity hurdle would present itself whether the action were commenced in a state court or a federal court and, within the federal court system, in whatever district the action might be brought. The State does not enjoy the choice of breaking the Band's conservation code by fishing upon the disputed lakes without a tribal license, then resisting the enforcement proceeding in the tribal courts, and then seeking whatever judicial review may be available elsewhere. Defendants suggest that one or more of the persons in whose interests the State purports to act as trustee is free to follow such a course of violating the code and resisting the enforcement proceedings. I will not presently decide whether such a course of conduct would be efficacious for an individual person, but I do observe that although the defendants' enforcement of the Band's conservation code obviously entails significant consequences for many nonmembers over the years, it is unlikely that each such nonmember will be prepared to engage in costly and lengthy litigation to challenge the license and license fee requirement.

For the reasons stated, if I enjoy discretion under Rule 19 to decide whether this action should proceed among the parties before the court, I would decide that it should proceed. However, it is suggested that controlling judicial precedent requires me to dismiss this action.

In *Minnesota v. United States,* 305 U.S. 382, 59 S.Ct. 292, 83 L.Ed. 235 (1939), the state commenced a condemnation proceeding in a state court to take a highway right of way over nine allotted parcels of land which formed part of an Indian reservation. The parcels had been allotted in severalty to individual Indians by trust patents. The condemnation petition named the United States as a party defendant, alleging that the United States held the fee in trust. The action was removed by stipulation to a United States district court. The United States appeared specially and moved to dismiss the action, asserting that it had not consented to the suit and that the state court had enjoyed no jurisdiction over the United States or over the action. The district court denied the motion on the ground that the United States was "not a necessary party" (384, 59 S.Ct. 292) because it had consented to the condemnation proceeding against the Indian allottees. On appeal, the court of appeals reversed, deciding that consent had not been given by the United States and that the district court lacked jurisdiction. Certiorari was granted, and the Supreme Court affirmed the judgment of the court of appeals. The Supreme Court decided that Congress had not authorized the suit. In the absence of such authorization (386–387, 59 S.Ct. 294):

> The United States is an indispensable party defendant to the condemnation proceedings. A proceeding against property in which the United States has an interest is a suit against the United States. [Citations omitted] It is confessedly the owner of the fee of the Indian allotted lands and holds the same in trust for the allottees. As the United States owns the fee of these parcels, the right of way cannot be condemned without making it a party. [Footnote omitted] The exemption of the United States from being sued without its consent extends to a suit by a state. [Citations omitted] Hence Minnesota cannot maintain this suit against the United States unless authorized by some act of Congress.

*Minnesota v. United States* illustrates the peculiar relationship between the doctrine of sovereign immunity and the doctrine of so-called indispensability of a party. See 7 Wright and Miller, Federal Practice and Procedure: Civil § 1617, pp. 172–179. The language of the Court in *Minnesota v. United States* is so cryptic as to suggest that in the absence of a sovereign with an interest in the subject matter, at least when the particular sovereign is the United States, an action simply must be dismissed without regard to pragmatic considerations.[4] One can see that if the feeholder of land cannot be joined as a party, whether because of sovereign immunity or some other reason, it would be impractical to permit a condemnation action by the state to proceed in its absence against other parties in interest. I conclude that this latter is the meaning of *Minnesota v. United States*; that unexpressed pragmatic considerations underlay the decision that the condemnation proceeding should not continue in the absence of the feeholder; and that the sovereignty of the absent feeholder was not the compelling factor. I am reenforced in this view by the fact that in cases in which the United States has an interest in the subject matter and has not waived its immunity, the principles embodied in the present version of Rule 19 have been invoked with the result that some actions have been permitted to proceed in its absence and some have not. See 7 Wright and Miller, *supra,* § 1617, at p. 171.

---

4.  *Minnesota v. United States* was argued in the Supreme Court November 10, 1938, and decided January 3, 1939. The Federal Rules of Civil Procedure became effective September 16, 1938. Rule 19 was anticipated to some extent by former Equity Rules 37, 39, and 42. No reference to any of these rules appears in the opinion of the Supreme Court. (Rule 19 was completely rewritten in 1966.)

The kinds of cases in which it has been held that the action should not proceed in the absence of the United States include condemnation proceedings (*Minnesota v. United States, supra,* (United States the feeholder)) and actions to quiet title (*Fontenelle v. Omaha Tribe of Nebraska,* 430 F.2d 143 (8th Cir. 1970) (United States "an indispensable party," where lands held by United States as trustee for Indians, but immunity waived by Congress in the circumstances); *Carlson v. Tulalip Tribes of Washington,* 510 F.2d 1337 (9th Cir. 1975) (location of boundary between plaintiffs' lands and lands to which United States holds title)). But in the present case, the State, not the United States, holds title to the beds of the navigable waters, and the United States appears not to have any interest in the subject matter except in the possible, and indirect, manner already discussed.

Therefore, I conclude that I am free to exercise the discretion contemplated by Rule 19 and I exercise it to decide that the action may proceed in the absence of the United States and the Band.

### LEGISLATIVE IMMUNITY

Defendants contend that they are immune from suit because the acts complained of are legislative acts, protected by the common law doctrine of legislative immunity. Plaintiff responds that the action does not attack defendants' legislative powers, but only their executive powers.

The relief plaintiff requests is a "judgment declaring the actions of the defendants and the promulgation and enforcement of the Conservation and Court Codes of the Tribe to be illegal and invalid insofar as they infringe [on rights plaintiff asserts]." Despite the reference to promulgation of the codes, the action is clearly directed toward defendants' enforcement of the codes. The tribal constitution indicates that defendants have executive power to enforce the code, as well as legislative power to enact it. Plaintiff does not seek to compel defendants to change or rescind their votes on the code, but only to end its enforcement.

### ACTION WAS IMPROPERLY REMOVED

Defendants contend that the federal court's jurisdiction can arise only derivatively from the state court's jurisdiction; that the state court in which this action was originally filed by plaintiff had no jurisdiction over the case; and that, therefore, this court has no jurisdiction. Defendants contend that the state court had no jurisdiction because the cause of action arose on an Indian reservation, where state court involvement would infringe upon the Indians' right of self-government. *See Fisher v. District Court,* 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976); *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251(1959); *Worcester v. Georgia,* 31 U.S. (6 Pet.) 350, 8 L.Ed. 483 (1832). In each of these cases, a crucial factor was that the acts which became the subject of state involvement had taken place on an Indian reservation. As I have pointed out, whether the lakes on which defendants are enforcing their codes are part of the reservation is the crucial issue on the merits of the case, and an issue on which further evidence is necessary to a decision. Accordingly, I will defer my decision on whether removal was proper in this case.

### FURTHER PROCEEDINGS

Two defenses raised by the defendants (the sovereignty of the Band and the absence of jurisdiction in the state trial court) turn upon the issue which is also central to the merits of the case: whether the parties to the 1854 treaty intended that the Band be granted the right to the exclusive use of the lakes in question by the device of including the lakes in the Lac Courte Oreilles reservation, and, if so, whether this intention was carried out.

Although I am reserving a ruling on the defendants' motion to dismiss with respect

to the two grounds mentioned in the preceding paragraph, I will require defendants to answer the amended complaint, so as to permit a trial following which the motion to dismiss will be fully decided and, if it were then to be denied, the merits will be decided.

In the order entered below, I will provide an opportunity to the parties to complete the factual record for all purposes.

## ORDER

It is hereby ordered:

1. Defendants' amended motion to dismiss is denied insofar as it rests on the ground that no genuine case or controversy exists.

2. Defendants' amended motion to dismiss is denied insofar as it rests on the ground that the legislative immunity of the defendants bars this action.

3. Defendants' amended motion to dismiss is denied insofar as it rests on the ground that plaintiff has failed to join the Band or the United States or both as parties.

4. In all other respects, a ruling is reserved on defendants' amended motion to dismiss.

5. On or before October 17, 1978, defendants are to serve and file an answer to the amended complaint.

6. On December 14, 1978, at 9:00 a.m., a consolidated evidentiary hearing on defendants' amended motion to dismiss and a trial on the merits will be held.

7. Unless written objection is served and filed by any party on or before November 10, 1978, I will find as fact for the purpose of the evidentiary hearing and trial referred to in paragraph 6, above:

(a) All of the facts found in the consolidated opinion and order entered today in *United States v. Bouchard, United States v. Ben Ruby & Sons et al.,* and *Lac Courte Oreilles Band v. Voigt.*

(b) The contents of the land selection list for the Lac Courte Oreilles reservation transmitted by the Acting Commissioner of Indian Affairs to the Secretary of the Interior on February 24, 1873, and the Secretary's approval dated March 1, 1873 (Exhibit C to plaintiff's complaint).

(c) The contents of a map of the reservation prepared for and accepted by the United States General Land Office on October 18, 1876 (attachment to defendants' reply brief).

(d) The contents of the Constitution and by-laws of the Lac Courte Oreilles Band (attachment to an affidavit by defendant Baker).

(e) The contents of the most recently amended tribal "Court Code" and tribal "Fishing, Hunting, Trapping and Ricing Code" (submitted to the court by defendants' counsel by letter dated May 19, 1978).

Any such written objection to the making of such findings shall identify precisely the findings objected to, and state explicitly the grounds for such objection.

8. A pretrial conference will be held on November 17, 1978, at 10:00 a.m. At the said conference, counsel and the court will discuss the form and manner of submission of additional evidence which any party may desire to submit. Counsel will be expected at that time to disclose fully their intentions. The court contemplates that such additional evidence will probably be in documentary form, but it also contemplates that the parties may desire to submit the testimony of witnesses, expert or otherwise.