## Motor Boat Licenses

RENO, Attorney General, December 21, 1939.—Referring to your letter of October 23, 1939, we note that during the last few years the board has had considerable trouble on the Allegheny and Monongahela Rivers, in enforcing the Act of May 28, 1931, P. L. 202, as amended, which makes provision for the licensing of all boats operated with an internal combustion motor. You state that motor boat owners operating motor boats on the Ohio River, from the Ohio State line to the City of Pittsburgh and northward have failed to comply with the act, and state that they are complying with the Federal laws and that is all they intend to do. We understand that these motor boats are used for pleasure only and that some of the motor boats are owned by persons residing in States other than Pennsylvania.

We note that the Federal authorities have called your attention to the Motor Boat Numbering Act of June 7, 1918, 40 Stat. at L. 602, 46 U. S. C. §288. This act provides for the numbering of undocumented vessels operated in whole or in part by machinery, owned in the United States and found on the navigable waters thereof, and provides that such numbers shall be painted or attached to the bow of the vessel and that no numbers not awarded shall be carried on the bow of such vessel. It

seems that the Federal authorities object to the fact that the Pennsylvania act provides for the placing of license numbers on the bow of the vessel.

The question is thus raised as to whether the Act of 1931, supra, can be enforced. This act, which was amended by the Act of May 31, 1933, P. L. 1122, the Act of May 7, 1935, P. L. 147, and the Act of June 21, 1937, P. L. 1984, is entitled as follows:

" 'An act providing for the licensing and regulation of motor boats operated or navigated upon any public stream, artificial or natural body of water, or non-tidal waters of any river within the Commonwealth; conferring powers and imposing duties on certain police officers and the Board of Fish Commissioners, including the enforcement of certain existing laws; and prescribing penalties,' by transferring certain powers and duties from the Board of Fish Commissioners to the Department of Revenue, further providing for the licensing and regulation of motor boats, and boats electrically propelled and providing for liability for damages caused by the negligent operation of a motor boat."

Sections 19 and 20 of 45 C. J., entitled "Navigable Waters", read as follows:

"A. In General—1. United States—a. Federal Control. By virtue of the commerce clause of the federal constitution and the clause empowering congress to make all laws necessary to carry into execution the federal judicial power in admiralty and maritime matters, 'navigable waters of the United States,' which include waters over which by themselves or in connection with other waters commerce may be carried on between states or with foreign countries, and of which admiralty has jurisdiction, are under the control of congress which has power to legislate in regard thereto so far as commerce is concerned. While this power is limited to control of the waters for purposes of navigation, it is a sovereign and supreme power within its appropriate sphere of action, and it is not lost or weakened by reason of previous inac-

tion or acquiescence by congress in the exercise of authority by a state, but the federal power, when and to the extent exercised, is exclusive of state authority. The federal power to control and improve navigable waters is also superior to the title of the state or of individuals to the land under water, and authority granted by the states confers extraordinary powers. It is for congress to determine when and to what extent its power shall be brought into activity, and it may be exercised through general or special laws. The power of congress extends to the whole expanse of a navigable stream and is not dependent on the depth of the water; also it follows natural changes in the channel or banks and is not limited by former conditions.

"b. State Control. Subject to the paramount authority of congress over commerce and the navigable waters of the United States, and to private property rights, a state has full power to legislate concerning the use of navigable waters which are within the territorial limits of the state, without regard to whether or not they connect with waters outside such limits. In other words the power of the state is plenary until the federal government sees fit to exercise its constitutional prerogative. *Ordinarily, however, legislation by the federal government is exclusive of the authority of the state upon the same subject, and always so where there is conflict, but not necessarily so otherwise.* A state is not deprived of power to legislate with reference to navigable waters except by a direct federal statute dealing with the matter in question, and is not deprived of such power by an act of congress making appropriations for the improvement of the waterway, or providing that the city situated upon or reached by the waterway is a port of entry, or establishing harbor lines where the state regulations do not conflict with those of the federal government. Provisions of the ordinance of 1787 for the government of the Northwest Territory, and similar provisions in the statutes admitting various states into the Union, that certain navigable rivers should be and remain highways, forever free, without any tax, im-

post, or duty thereon, have been generally held not to take away the power which the state could otherwise exercise over such waters, since such provisions do not refer to physical obstructions but political regulations. *Furthermore it is recognized that the states have powers of control and regulation over navigable waters which can be exercised as a matter of local or state policy without interfering with the paramount right of navigation and which are or should be exempt from federal interference.* While a state has no power to divert the use of a navigable water to other purposes, to impair the rights of the federal government in its control of its waters in the interest of navigation, or to close any navigable water of the United States, it may close small and unimportant waters, although navigable to some extent, especially where the stream has been declared nonnavigable by congress. In border streams a state has no authority to interfere with the opposite shores or common rights of navigation." (Italics supplied.)

In the case of Wiggins Ferry Co. v. East St. Louis, 107 U. S. 365, the court said, at page 377:

"The power of Congress to require vessels to be enrolled and licensed is derived from the provision of the Constitution which authorizes it 'to regulate commerce with foreign nations and among the several States.' We have already seen that this court, in *Fanning v. Gregoire, ubi supra,* has held that this right of Congress 'does not interfere with the police powers of a State in granting ferry licenses.'

"These authorities show that the enrolment and licensing of a vessel under the laws of the United States does not of itself *exclude the right of a State to exact a license from her own citizens on account of their ownership and use of such property having its situs within the State.*" (Italics supplied.)

In the case of Pullman's Palace Car Co. v. Pennsylvania, 141 U. S. 18, the court said (p. 23):

"Ships or vessels, indeed, engaged in interstate or foreign commerce upon the high seas, or other waters which are a common highway, and having their home port, at which they are registered under the laws of the United States, at the domicil of their owners in one State, are not subject to taxation in another State at whose ports they incidentally and temporarily touch for the purpose of delivering or receiving passengers or freight. But that is because they are not, in any proper sense, abiding within its limits, and have no continuous presence or actual situs within its jurisdiction, and, therefore, can be taxed only at their legal situs, their home port and the domicil of their owners."

In the case of International Transit Co. v. City of Sault Ste. Marie et al., 194 Fed. 522, 527, the court said, in discussing the Wiggins Ferry case, supra:

"The basic principle underlying this decision of the Supreme Court seems to be that a municipality has the power to tax property located within its limits or to exact a license fee from the owners thereof living within its limits for the privilege of using and employing such property in a quasi public service, and that the exercise of such power, when applied to persons engaged in and to instruments employed in interstate commerce, is not an invasion of the exclusive power of Congress to regulate commerce conferred upon it by the Constitution. Thus construed and limited, the Wiggins Ferry Case falls far short of sustaining defendants' contention that the city of Sault Ste. Marie, by virtue of its charter powers derived from the state, *has the right to exact a license fee from a citizen of a foreign country for the privilege of operating ferryboats, whose situs is in such foreign country*, in the ferriage of passengers and property from a private wharf in the defendant city across an international boundary river to a landing upon the opposite shore. By inference at least, the right to exact such license fee is negatived in the following cases, where the Wiggins Ferry Case is cited and construed: Moran v. New Or-

leans, 112 U. S. 69-74, 5 Sup. Ct. 38, 28 L. Ed. 653; Pickard v. Pullman Southern Car Co., 117 U. S. 34-50, 6 Sup. Ct. 635, 29 L. Ed. 785; Pullman's Car Co. v. Pennsylvania, 141 U. S. 18-23, 11 Sup. Ct. 876, 35 L. Ed. 613." (Italics supplied.)

In 37 C. J. §§12 and 13, under the title "Licenses", it is said:

"Congress has power to impose, for the support of the general government, license taxes on businesses and avocations carried on in the several states; *but it has no power to require a license for a wholly intra-state business or occupation. A federal license or license tax, however, on a given business or avocation does not interfere with the state's right to regulate by license or tax, or to prohibit such business or avocation within its borders; and a person who has taken out a license or paid a tax imposed on a certain business by act of congress may also be compelled to pay a state tax or take out a state license for the same business.* But the state cannot require the holder of a federal license to perform duties in conflict with the requirements of the federal statute. (Italics supplied.)

"C. Power of States—1. In General. Subject to the limitations or restrictions imposed by the constitution of the United States, or by the state constitution, and to the limitation that no federal right be interfered with, a state legislature may, either in the exercise of the police power or for the purposes of revenue, require licenses or impose license taxes on occupations or privileges within the limits of the state, when it deems them to be warranted by considerations of public interest and for the general welfare. In some states this form of legislation is expressly authorized by the state constitution; but as such power is inherent in the legislature, unless prohibited, such constitutional authority is generally not necessary, or if given is regarded as merely declaratory of a right that already exists; and the fact that it authorizes taxation as to certain enumerated occupations

does not limit the legislature's power to the particular occupations specified.

"Outside business. This power of the state, however, is necessarily limited to subjects within its jurisdiction; it cannot tax persons residing within its borders on account of business which they carry on beyond its jurisdiction."

We are, therefore, of opinion and you are accordingly advised that the Act of May 28, 1931, P. L. 202, as amended, may be enforced to the extent that a license fee may be exacted from the citizens of Pennsylvania on account of their ownership and use of motor boats having their situs within the Commonwealth of Pennsylvania.