709 F.2d 1250
 GRAND CANYON DORIES, INC., Plaintiff-Appellant,
and
James Gellein, dba Flying H Ranch, Plaintiff,
v.
IDAHO OUTFITTERS AND GUIDES BOARD; Rex Lanham; Bill Guth,
Jr.; James E. Baughman; and Lon S. Jarvis,
Defendants-Appellees.
 No. 81-3599.
 United States Court of Appeals,
Ninth Circuit.
 Submitted Oct. 7, 1982.
Decided June 7, 1983.
 
 James Reid, Reid & Morfitt, Boise, Idaho, for plaintiff-appellant.
 Don A. Olowinski, Asst. U.S. Atty., Boise, Idaho, for defendants-appellees.
 Appeal from the United States District Court for the District of Idaho.
 Before WALLACE, FARRIS, and NELSON, Circuit Judges.
 WALLACE, Circuit Judge:
 
 
 1
 Grand Canyon Dories, Inc. (Grand Canyon Dories) conducts a commercial white-water rafting operation on portions of the Snake River that flow through Idaho. The parties stipulated that the Snake River is a navigable body of water in the federal sense, that the United States Coast Guard, the Bureau of Land Management, and the National Forest Service all have jurisdiction over certain activities connected with Grand Canyon Dories's Snake River expeditions, and that Grand Canyon Dories uses Idaho's side of the river for both rafting and camping. The State of Idaho's boundary is located in the middle channel of the Snake River.
 
 
 2
 The Idaho Outfitters and Guides Act, Idaho Code Secs. 36-2101-2118 (1977 & Supp.1982) (Outfitters and Guides Act), requires all commercial raft outfitters and guides on the Idaho portion of the Snake River to obtain licenses. The Idaho Outfitters and Guides Board (the Board) is authorized to conduct examinations and review license applications to determine applicants' qualifications. Grand Canyon Dories admits that the Outfitters and Guides Act applies to its activities if the Act is constitutional.
 
 
 3
 Grand Canyon Dories sued for a declaratory judgment that the licensing provisions of the Outfitters and Guides Act violate the commerce and supremacy clauses of the United States Constitution. The district court granted summary judgment in favor of the Board, holding that (1) the purpose of the Outfitters and Guides Act is to promote a legitimate local interest, (2) federal regulation does not preempt the field, and (3) the Outfitters and Guides Act does not impose an undue burden on interstate commerce. We review the summary judgment under the de novo standard. See State ex rel. Edwards v. Heimann, 633 F.2d 886, 888 n. 1 (9th Cir.1980). We affirm.
 
 
 4
 * Grand Canyon Dories appeals the district court's determination that federal legislation has not preempted the field which the Outfitters and Guides Act seeks to govern. If the field is preempted, of course, the Outfitters and Guides Act is invalid under the supremacy clause. U.S. Const. art. VI, cl. 2.
 
 
 5
 The case before us does not involve an area of the law inherently requiring national uniformity, see, e.g., Head v. New Mexico Board of Examiners in Optometry, 374 U.S. 424, 430, 83 S.Ct. 1759, 1763, 10 L.Ed.2d 983 (1963); Hines v. Davidowitz, 312 U.S. 52, 63, 61 S.Ct. 399, 402, 85 L.Ed. 581 (1941), nor an area in which federal and state laws conflict. See Jones v. Rath Packing Co., 430 U.S. 519, 525-26, 97 S.Ct. 1305, 1309-10, 51 L.Ed.2d 604 (1977); Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43, 83 S.Ct. 1210, 1217-1218, 10 L.Ed.2d 248 (1963). Thus, the issue before us is whether Congress intended to regulate exclusively the area in question. Malone v. White Motor Corp., 435 U.S. 497, 504, 98 S.Ct. 1185, 1189, 55 L.Ed.2d 443 (1978); Head v. New Mexico Board of Examiners in Optometry, 374 U.S. at 430, 83 S.Ct. at 1763.
 
 
 6
 Where, as here, the state exercises its traditional police powers, there must be a clear and manifest congressional indication of an intent to preempt. The Court has stated that "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." Jones v. Rath Packing Co., 430 U.S. at 525, 97 S.Ct. at 1309, quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947); see also, e.g., Malone v. White Motor Corp. (state statute regulating pensions not preempted by federal law until new federal statute enacted expressly providing for preemption); City of Philadelphia v. New Jersey, 437 U.S. 617, 620 n. 4, 98 S.Ct. 2531, 2533-34 n. 4, 57 L.Ed.2d 475 (1978) (no clear and manifest congressional intent to preempt); Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 132, 98 S.Ct. 2207, 2217, 57 L.Ed.2d 91 (1978) (Court is reluctant to infer preemption); Jones v. Rath Packing Co., 430 U.S. at 525, 97 S.Ct. at 1309 ("This assumption provides assurance that 'the federal-state balance' will not be disturbed unintentionally by Congress or unnecessarily by the courts.") (citation omitted); New York State Department of Social Services v. Dublino, 413 U.S. 405, 413-14, 93 S.Ct. 2507, 2512-13, 37 L.Ed.2d 688 (1973) (Court will not void state statutory programs absent clear manifestation of congressional intent); accord Confederated Tribes of the Colville Indian Reservation v. Washington, 591 F.2d 89, 91 (9th Cir.1979). Moreover, "courts are not to seek out conflicts between state and federal regulation where none clearly exist." Pacific Legal Foundation v. State Energy Resources Conservation & Development Commission, 659 F.2d 903, 919 (9th Cir.1981), cert. granted in part sub nom. Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission, 457 U.S. 1132, 102 S.Ct. 2956, 73 L.Ed.2d 1348, cert. denied, 457 U.S. 1133, 102 S.Ct. 2959, 73 L.Ed.2d 1350 (1982).
 
 
 7
 The Supreme Court has provided some general guidance for our review of whether Congress has evinced a clear and manifest purpose to preempt an area. For example, in Rice v. Santa Fe Elevator Corp., the Court stated that:
 
 
 8
 Such a [clear and manifest preemptive] purpose may be evidenced in several ways. The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. Or the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. Likewise, the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose. Or the state policy may produce a result inconsistent with the objective of the federal statute.
 
 
 9
 331 U.S. at 230, 67 S.Ct. at 1152 (citations omitted); see Pennsylvania v. Nelson, 350 U.S. 497, 502-10, 76 S.Ct. 477, 480-484, 100 L.Ed. 640 (1956); see also City of Burbank v. Lockheed Air Terminal, Inc., 411 U.S. 624, 633, 93 S.Ct. 1854, 1859, 36 L.Ed.2d 547 (1973) (pervasive federal scheme preempted local regulation even though no express preemption provision in federal act); Campbell v. Hussey, 368 U.S. 297, 300-02, 82 S.Ct. 327, 328-30, 7 L.Ed.2d 299 (1961) (need for uniformity in official standards requires invalidation of state laws which do not conflict with, but merely supplement, federal statutes). Nevertheless, it is clear that each case must be reviewed individually and that "none of these expressions provides an infallible constitutional test or an exclusive constitutional yardstick. In the final analysis, there can be no one crystal clear distinctly marked formula." Hines v. Davidowitz, 312 U.S. at 67, 61 S.Ct. at 404.
 
 
 10
 Although we review each case individually, a recent Supreme Court decision concerning state regulation of activities related to navigable waterways is particularly instructive. In Ray v. Atlantic Richfield Co., 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978), the Court invalidated three parts of the Washington Tanker Law on the basis of the supremacy clause. First, the Court struck down the portion requiring a state licensed pilot on a tanker enrolled in the coastwise trade during navigation on Puget Sound because it directly conflicted with a federal statute. Id. at 158-59, 98 S.Ct. at 994-95. The Court, however, stated that the district court's judgment was overly broad, confirming that states may impose pilotage requirements on registered vessels entering and leaving their ports, as contrasted with vessels enrolled in coastwise trade. Id. at 159-60, 98 S.Ct. at 995-96. Second, the Court invalidated the portion of the Washington Tanker Law prescribing design characteristics for oil tankers, finding "that Congress intended uniform national standards for design and construction of tankers that would foreclose the imposition of different or more stringent state requirements." Id. at 163, 164-68, 98 S.Ct. at 997, 998-1000. The Court, however, expressly reaffirmed its prior cases permitting state regulation of activities related to the use of navigable waterways, such as those pertaining to reasonable, nondiscriminatory conservation and environmental statutes. Third, the Court invalidated the portion of the Washington Tanker Law totally excluding tankers exceeding a certain size from Puget Sound. Id. at 173-74, 98 S.Ct. at 1002-1003. The Court found that the Secretary of Transportation is authorized expressly to regulate vessel size and that he had acted to establish a size limitation in Puget Sound. Id. at 174-75, 98 S.Ct. at 1002-1003.
 
 
 11
 The Court, however, upheld the portion of the Washington Tanker Law requiring tug escorts for tankers exceeding a certain weight and not complying with the state's design requirements. Id. at 168-69, 98 S.Ct. at 999-1000. Even though the Secretary of Transportation is authorized to impose a tug-escort requirement, the Court upheld Washington's requirement in the absence of a federal tug-escort requirement or a decision by the Secretary of Transportation that no tug-escort requirement should be imposed. Id. at 171-72, 98 S.Ct. at 1001-1002. In addition, the Court held that the State of Washington could constitutionally impose the tug-escort rule only on those tankers failing to meet state-prescribed design standards. Id. at 173, 179-80, 98 S.Ct. at 1002, 1005-06. See also Huron Portland Cement Co. v. City of Detroit, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960) (upholding application of criminal provisions of city's smoke abatement ordinance to ships operating in interstate commerce and subject to federal inspection and licensing) (collected cases); Kelly v. Washington, 302 U.S. 1, 58 S.Ct. 87, 82 L.Ed. 3 (1937) (upholding state law requiring inspection of hull and machinery of vessels not encompassed by federal requirements to insure safety and seaworthiness); cf. Moran v. New Orleans, 112 U.S. 69, 5 S.Ct. 38, 28 L.Ed. 653 (1884) (holding city tax on towboats operating in navigable waters invalid).
 
 II
 
 12
 We agree with the Board that the State of Idaho acted pursuant to its police power in enacting and implementing the Outfitters and Guides Act and thus is entitled to deference. See Huron Portland Cement Co. v. City of Detroit, 362 U.S. at 442, 80 S.Ct. at 815; Skiriotes v. Florida, 313 U.S. 69, 75, 61 S.Ct. 924, 928, 85 L.Ed. 1193 (1941). The regulation of commercial white-water rafting activities is not an area that inherently requires national uniformity. See Ray v. Atlantic Richfield Co., 435 U.S. at 179, 98 S.Ct. at 1005; Kelly v. Washington, 302 U.S. at 14-15, 58 S.Ct. at 94. Further, as we discuss later, we conclude that the Outfitters and Guides Act does not conflict with the federal statutes cited by Grand Canyon Dories. See Jones v. Rath Packing Co., 430 U.S. at 525-26, 97 S.Ct. at 1309-10. Therefore, Idaho's statute is valid unless Congress has evinced a clear and manifest purpose to preempt the area regulated by the Outfitters and Guides Act. Rice v. Santa Fe Elevator Corp.
 
 
 13
 Grand Canyon Dories cites several federal statutes, claiming that they preempt Idaho's regulation of commercial rafting activities along the Idaho portion of the Snake River. We hold that none of the statutes directly conflict with the Outfitters and Guides Act. We also hold that none of the statutes cited by Grand Canyon Dories evince a clear and manifest congressional intent to preempt the state's regulation of commercial rafting operations.
 
 
 14
 First, Grand Canyon Dories argues that Congress preempted state regulation through the Federal Boat Safety Act of 1971. 46 U.S.C. Secs. 1451-89 (1976, Supp. IV 1980 & Supp. V 1981) (Boat Safety Act). That Act, however, is directed toward ensuring that recreational boats and equipment are manufactured according to federal standards. The Boat Safety Act addresses the use of boats to a limited extent, see id. Sec. 1461(d) (negligent use of vessel); id. Sec. 1461(e) (vessels equipped with propulsion machinery carrying passengers for hire, not otherwise subject to Coast Guard manning requirements, must be in the charge of a licensed person); id. Sec. 1465 (duty to render assistance in an accident), but is not directed toward the activities covered by the Outfitters and Guides Act. In contrast to the federal act, the Outfitters and Guides Act seeks to ensure safety in white-water rafting, hunting, and other activities conducted for profit by guides and outfitters. See Huron Portland Cement Co. v. City of Detroit, 362 U.S. at 445, 80 S.Ct. at 817 ("[T]he purpose of the federal inspection statutes is to insure the seagoing safety of vessels subject to inspection.... By contrast, the sole aim of the Detroit ordinance is the elimination of air pollution to protect the health and enhance the cleanliness of the local community."); Skiriotes v. Florida, 313 U.S. at 75, 61 S.Ct. at 928 ("[The federal act] is limited to the particular matter of [sponge] size and does not deal with the divers' apparatus which is the particular subject of the Florida statute.").
 
 
 15
 To the extent that the Outfitters and Guides Act requires equipment not required by the federal act, Congress expressly declined to preempt the type of requirements imposed by the Idaho law.
 
 
 16
 This section [46 U.S.C. Sec. 1459 (1976) ] provides for federal preemption in the issuance of boat and equipment safety standards.... At the same time, it was recognized that there may be serious hazards which are unique to a particular locale and which would justify variances at least with regard to the carriage or use of marine safety articles on boats. Therefore, the section does permit individual States to impose requirements with respect to carrying or using marine safety articles which go beyond the federal requirements when necessary to meet uniquely hazardous local conditions or circumstances. A right of disapproval, however, is reserved to the Secretary to insure that indiscriminate use of state authority does not seriously impinge on the basic need for uniformity.
 
 
 17
 S.Rep. No. 248, 92d Cong., 1st Sess. ---, reprinted in 1971 U.S.Code Cong. & Ad.News 1333, 1341. The record does not show any express federal action disapproving Idaho's statute and regulations. See Ray v. Atlantic Richfield Co., 435 U.S. at 171-72, 98 S.Ct. at 1001-1002 (Secretary authorized to impose tug-escort requirement, but state's requirement not preempted until Secretary acts or decides that no requirement should be imposed). In addition, the Boat Safety Act expressly does not preempt state regulations directed at safe boat operation and use. S.Rep. No. 248, 92d Cong., 1st Sess. ---, reprinted in 1971 U.S.Code Cong. & Ad.News 1333, 1341.
 
 
 18
 Grand Canyon Dories argues further that the portions of rule 25 under the Outfitters and Guides Act specifying required safety equipment is substantially identical to federal regulations and is therefore preempted. We agree with the Board, however, that the Boat Safety Act does not preempt the parts of these state regulations that are identical to federal regulations promulgated under 46 U.S.C. Sec. 1454. 46 U.S.C. Sec. 1459 (1976); see State v. Nettleton, La., 367 So.2d 755, 758-59 (La.1979). To the extent that rule 25 is not identical to federal requirements and requires the carrying of safety equipment such as an extra oar or paddle, it addresses unique local characteristics and is therefore not preempted. 46 U.S.C. Sec. 1459 (1976).
 
 
 19
 Grand Canyon Dories also argues that the Small Passenger-Carrying Vessels Act, 46 U.S.C. Secs. 390-390g, 404 (1976, Supp. IV 1980 & Supp. V 1981), preempts the field regulated by the Outfitters and Guides Act. We disagree. The principal purpose of the Small Passenger-Carrying Vessels Act is to provide for safety inspections of vessels within its coverage. Notably, the federal act applies only to vessels carrying more than six passengers, exclusive of crew members. Id. Sec. 390. The record on appeal does not reveal the number of passengers carried on the white-water raft trips conducted by Grand Canyon Dories or other specifications bringing the boats used by Grand Canyon Dories within the scope of the federal act. Id. Sec. 390(b). Thus, federal regulations may not apply. Assuming, however, that Grand Canyon Dories's activities are affected by the Small Passenger-Carrying Vessels Act, we find no clear and manifest congressional intent to preempt state regulation. See S.Rep. No. 1872, 84th Cong., 2d Sess. ---, reprinted in 1956 U.S.Code Cong. & Ad.News 2527. Although the federal act provides for Coast Guard regulation of the waters in which vessels may be navigated, the number of passengers, the manning of the vessels, and the duties and qualifications of crew members, 46 U.S.C. Sec. 390b (1976, Supp. IV 1980 & Supp. V 1981), the statute does not provide for preemption of state regulation. On the record before us, it does not appear impossible to comply with both the state guidelines and any applicable federal rules; nor does the state law appear to frustrate the federal scheme in any way. Moreover, the record does not demonstrate that the Coast Guard has exercised any authority it may have to regulate white-water rafting on Idaho's rivers. See Ray v. Atlantic Richfield Co., 435 U.S. at 171-72, 98 S.Ct. at 1001-1002.
 
 
 20
 Grand Canyon Dories fares no better with the argument that Congress's delegation of control over various aspects of its Snake River activities to the National Forest Service, the Bureau of Land Management, and the Coast Guard indicates preemptive intent. Provisions for regulation of campsites, land management, and general safety in United States waters do not indicate a clear and manifest intent to preempt state regulation of the outfitters and guides industry. Although federal regulations limit the number of persons that may operate on the Snake River, the regulations are directed toward control of federally-owned campgrounds. Further, the Wild and Scenic Rivers Act which authorizes the federal regulations expressly provides for concurrent state jurisdiction except for state regulations impairing the purposes of the federal act. 16 U.S.C. Sec. 1284(d) (1976). The Outfitters and Guides Act, however, contributes to the federal goal of preserving scenic river areas. See Idaho Code Sec. 36-2101 (1977).
 
 III
 
 21
 Grand Canyon Dories also appeals the district court's determination that the Outfitters and Guides Act promotes a legitimate local interest and does not impose an undue burden on interstate commerce. We do not reach the issue whether Grand Canyon Dories's rafting operation constitutes interstate commerce, but assume for purposes of our analysis that a commercial rafting operation along a river traversing more than one state constitutes interstate commerce. The question before us is whether the restrictions imposed on Grand Canyon Dories's activities by the Outfitters and Guides Act are constitutionally acceptable.
 
 
 22
 We must determine whether the Outfitters and Guides Act imposes an undue burden on interstate commerce under the following test:
 
 
 23
 Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.
 
 
 24
 Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970) (citation omitted); accord Hughes v. Oklahoma, 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979).
 
 
 25
 We hold that the Outfitters and Guides Act regulates evenhandedly to promote a legitimate local public interest with only an incidental effect on interstate commerce. The Act promotes safety in recreational activities and adequate service to tourists employing outfitters and guides. It helps to preserve scenic and unique river areas. Further, it is directed expressly toward providing recreational opportunities to residents and nonresidents alike. Idaho Code Sec. 36-2101 (1977). As stated in the Act:
 
 
 26
 The intent of this legislation is to promote and encourage residents and nonresidents alike to participate in the enjoyment and use of the mountains, rivers and streams of Idaho, and the fish and game therein, and to that end to regulate and license those persons who undertake for compensation to provide equipment or personal services to such persons, for the explicit purpose of safeguarding the health, safety, welfare and freedom from injury or danger of such persons, in the exercise of the police power of this state.
 
 
 27
 Idaho Code Sec. 36-2101 (1977).
 
 
 28
 The Act regulates evenhandedly. The licensing requirement applies to Idaho residents as well as to nonresidents. Id. Sec. 36-2104 (Supp.1982). Both residents and nonresidents can be denied a license. More important, resident and nonresident applicants for licenses are judged under the same criteria. Id. Sec. 36-2109(b). Idaho also requires licenses for outfitters and guides using strictly intrastate rivers. Id. Sec. 36-2102. The only distinction made between residents and nonresidents is in the amount of the license fee. Nonresidents pay $175 for an outfitter's license and $100 for a guide's license; residents pay $100 for an outfitter's license and $50 for a guide's license. Id. Sec. 36-2108(3). In our view, the license fee differential is too small to have anything but an incidental effect on interstate commerce. Cf. Baldwin v. Fish & Game Commission, 436 U.S. 371, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978) (upholding Montana elk-hunting license scheme which imposed substantially higher license fees on nonresidents under the privileges and immunities and equal protection clauses). See generally Lewis v. BT Investment Managers, Inc., 447 U.S. 27, 42, 100 S.Ct. 2009, 2018-19, 64 L.Ed.2d 702 (1980) ("[T]he disparate treatment of out-of-state bank holding companies cannot be justified as an incidental burden necessitated by legitimate local concerns."); City of Philadelphia v. New Jersey, 437 U.S. at 624, 98 S.Ct. at 2536 ("The crucial inquiry ... must be directed to determining whether [a state regulation] is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental.").[1]
 
 
 29
 The minimal burden which the Outfitters and Guides Act imposes on interstate commerce is more than offset by its benefits. In view of the Act's very minimal effect on interstate commerce, it is difficult to imagine that Idaho's river safety and resource conservation goals could be achieved with legislation having less impact on interstate commerce.
 
 
 30
 AFFIRMED.
 
 
 
 [1]
 Because Grand Canyon Dories has not raised the issue whether the license fee provision of the Idaho Outfitters and Guides Act violates the privileges and immunities clause, we do not pass upon that issue. See Baldwin v. Fish & Game Commission, 436 U.S. 371, 388, 98 S.Ct. 1852, 1862, 56 L.Ed.2d 354 (1978)